**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

RAJNI GANDHI,

                              Plaintiff,

            v.                                                    1:20-cv-00120 (AMN/DJS)

NEW YORK STATE UNIFIED COURT SYSTEM,
*et al.*,

                              Defendants.

**APPEARANCES:**                                      **OF COUNSEL:**

**CAPEZZA HILL, LLP**                                 **ABBY MCCORMICK-FOLEY,**
30 South Pearl Street, Suite P-110                    **ESQ.**
Albany, New York 12207
*Attorneys for Plaintiffs*

**HON. LETITIA JAMES**                                **JORGE A. RODRIGUEZ, ESQ.**
New York State Attorney General                       **LELA M. GRAY, ESQ.**
The Capitol
Albany, New York 12224
*Attorneys for Defendant*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

On February 4, 2020, then-*pro se* Plaintiff Rajni Gandhi ("Plaintiff") commenced this

action against the New York State Unified Court System ("Defendant"); Anthony Mancino,

Laureen Lee, and Beth Diebel ("Individual Defendants"); and others, alleging state and federal

claims related to the termination of her employment at Defendant on January 7, 2019.  Dkt. No.

1.[1]  Plaintiff requested and received permission to proceed *in forma pauperis*.  Dkt. Nos. 2, 6.

Following *sua sponte* review pursuant to 28 U.S.C. § 1915(e), *see* Dkt. Nos. 7, 12, 14–15; the

Court's (Kahn, J.) dismissal of certain claims against Individual Defendants, *see* Dkt. Nos. 50 and

56; the Court's (Kahn, J.) grant of summary judgment in favor of Individual Defendants and denial

of summary judgment in favor of Defendant on January 31, 2024, *see* Dkt. No. 134; and the Court's

(Kahn, J.) denial via text order of Defendant's related motion for reconsideration on February 27,

2024, *see* Dkt. No. 139; only Plaintiff's religious discrimination claim under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), against Defendant remains.

For purposes of summary judgment, the Court (Kahn, J.) analyzed Plaintiff's Title VII

claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802–04 (1973).  Because this analysis was performed without the benefit of the Second

Circuit's subsequent decisions in *Bart v. Golub Corp.*, 96 F.4th 566, 575 (2d Cir. 2024) ("We take

this opportunity to demystify the third-stage burden under *McDonnell Douglas*, which has

admittedly not always been articulated in our case with the utmost clarity[.]") and *King v. Aramark

Services Inc.*, 96 F.4th 546 (2d Cir. 2024), on July 11, 2024, the Court[2] directed the parties,

pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, to file supplemental briefing

addressing the issue and to file any necessary motion papers in compliance with Rules 7.1 and

56.1 of the Local Rules of the Northern District of New York.  Dkt. No. 146.

Presently before the Court is Defendant's second motion for summary judgment pursuant

to Rule 56 of the Federal Rules of Civil Procedure, Dkt. No. 147 ("Motion"), Plaintiff's opposition,

---

[1] Plaintiff's amended *pro se* complaint, filed on April 24, 2020, is the operative pleading in this case.  Dkt. No. 10 ("Complaint").

[2] This case was reassigned to the undersigned on April 10, 2024.  Dkt. No. 141.  The Court subsequently appointed Plaintiff *pro bono* counsel.  Dkt. No. 142.

Dkt. No. 150, and Defendant's reply in further support, Dkt. No. 151. For the reasons set forth below, Defendant's Motion is granted.

## II.    BACKGROUND[3]

### A.  The Parties

Defendant is the judicial branch of New York State Government, established pursuant to Article VI of the New York State Constitution. Dkt. No. 125-9 at ¶ 2. At all relevant times, Defendant employed: Beth Diebel, as the District Executive for the Third Judicial District, *id.* at ¶¶ 3–5; Anthony Mancino, as the Chief Clerk of the Albany City Court within the Third Judicial District, *id.* at ¶ 7; Laureen Lee, as Plaintiff's direct supervisor, Dkt. No. 125-3 at ¶ 6, and the Deputy Chief Clerk of the Albany City Court, Criminal Part, Dkt. No. 125-9 at ¶¶ 11–12; and Plaintiff, as a Senior Court Office Assistant in the Albany City Court, Criminal Part, *id.* at ¶¶ 1, 21–22.

### B.  Plaintiff's Employment

Plaintiff worked at Defendant from April 2001 until January 2019. Dkt. No. 150-2 at 22:18–23;[4] Dkt. No. 125-2 at 179.

Among Plaintiff's job responsibilities, approximately 50 to 80 percent of her workday involved retrieving, refiling, carrying, and moving court case files, as she responded to inquiries from litigants and attorneys, processed fine payments and correspondence, prepared certificates of

---

[3] Both parties rely upon their prior statements of material facts for purposes of the present Motion. *See* Dkt. No. 147-1 at 4; Dkt. No. 150 at 4. Accordingly, and unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response. *See* N.D.N.Y. L.R. 56.1. The Court has also considered the parties' other submissions and attached exhibits. *See generally* Dkt. Nos. 125–26, 128, 147, 150–51.

[4] Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and no the documents' internal pagination.

disposition, prepared court calendars, and responded to requests for case files. Dkt. No. 125-9 at

¶¶ 22–23. The historical performance evaluations which Plaintiff submitted largely indicate that

she met expectations. For instance, the March 2005 evaluation from Defendant Mancino (in his

former role) states that Plaintiff "meets expectations" in 21 areas and "needs improvement" in five,

Dkt. No. 70-2 at 112–14, while the March 2012 evaluation from Defendant Lee states that Plaintiff

"meets expectations" in most areas, *id.* at 118–20.

Between 2011 and 2018, Plaintiff requested and received three weeks of annual leave each

February in order to travel to India.[5] Dkt. No. 150-2 at 110:5–8; Dkt. No. 125-9 at ¶ 92. Plaintiff

testified in her deposition that she was "born in a Hindu family" and that Radha Soami Satsang

Beas[6] is "a church that [she] follow[s] now." Dkt. No. 150-2 at 286:8–24; *see also* Dkt. No. 10 at

10–11. When asked what she would do during her trips to India, Plaintiff explained:

> I attend discourses given by the teacher there. And I meditate. And I serve, you
> know, the -- the visitors there that come there. Others like me, I volunteer to help
> at the -- what would you call it the -- in India, they use the word hostel, you know,
> where people come and stay for duration of the trip. So I help. . . . with, you know,
> the check-in process there.

Dkt. No. 150-2 at 288:23–289:10.

---

[5] Depending on staffing levels, the Albany City Court generally had several dozen employees. Dkt. No. 125-9 at ¶¶ 10, 13. During the years in which she received three consecutive weeks of annual leave, Plaintiff was aware of only two coworkers who requested a similar amount of consecutive annual leave, and she did not know whether either request was ultimately granted. Dkt. No. 150-2 at 450:11–452:20.

[6] *See* RADHA SOAMI SATSANG BEAS, https://rssb.org/index.html (last visited October 16, 2024) ("Radha Soami Satsang Beas (RSSB) along with its international affiliates is a religious organization guided by the fundamental spiritual beliefs found at the heart of most religions, under the mentorship of a living spiritual teacher. . . . By performing the meditation practice according to the teacher's instructions, individuals can realize the presence of God within themselves. It is a solitary practice that is done in the quiet of one's own home. Members commit themselves to a way of life that supports spiritual growth while carrying out their responsibilities to family, friends and society. There are no rituals, ceremonies, hierarchies or mandatory contributions, nor are there compulsory gatherings.").

In or about April 2017, Plaintiff informed Defendants that she had a physical condition that limited her ability to physically handle files. Dkt. No. 125-9 at ¶ 24. Plaintiff provided documentation from a medical professional stating that she should "refrain from filing." Dkt. No. 126 at 2. At Defendant's request, Plaintiff's treating physician provided more information, indicating that Plaintiff had numerous physical limitations, and stated "please keep [Plaintiff] from filing." Dkt. No. 125-9 at ¶ 27; Dkt. No. 126-1 at 2. Subsequently, Plaintiff's co-workers performed her job responsibilities by retrieving and carrying files for her, but objected to doing so. Dkt. No. 125-9 at ¶¶ 28–29.

In June 2017, Defendant requested further information from Plaintiff's treating physician regarding her limitations and stated in relevant part:

> Filing is an integral of [Plaintiff]'s duties. On a daily basis, she retrieves and re-files case files numerous times. Please advise us, being as specific as possible, as to the frequency and length of the rest periods during her 7-hour workday. What is the duration of her limitations and when will she be able to resume the full duties and responsibilities of her position?

Dkt. No. 126-2 at 3.

In response, Plaintiff's physician provided updated documentation that stated: "please keep [Plaintiff] from filing until further notice." *Id.* at 4; Dkt. No. 125-9 at ¶ 31. In August 2017, Defendant met with Plaintiff to discuss potential reasonable accommodations given her work limitations. Dkt. No. 125-9 at ¶¶ 32–33. Following this meeting, Defendant requested such reasonable accommodations from Plaintiff's treating physician and stated in relevant part:

> [Your prior] documentation specifically indicated that [Plaintiff] should be kept from filing until further notice.
>
> Filing is an integral part of [Plaintiff]'s job duties. She spends the majority of her workday retrieving and refiling case files. As such, we recently met with her to discuss her job duties and her ability to perform filing tasks. We asked her what, if any, reasonable accommodations could be made to assist her in performing her job duties and suggest[ed] that she contact you to discuss. We advised her that we

5

would contact you for information as well (a completed HIPAA form is attached).

Please provide me with updated information regarding the duration of [Plaintiff]'s limitations, when she could be expected to resume her full duties and any possible, reasonable accommodations you believe will enable [Plaintiff] to perform her job duties as soon as possible.

Dkt. No. 125-2 at 10.

In November 2017, Defendant received a response from Plaintiff's physician stating, *inter*

*alia*, that:

[Plaintiff] has a degenerative arthritic condition of her upper cervical spine. . . . At some point she may need surgery for this condition. She has other comorbid medical issues, and we have been reluctant to proceed with surgery thus far.

[Plaintiff] has been advised to avoid heavy lifting, bending, filing, [and] prolonged periods of time while answering the phone. These activities aggravate her clinical symptoms. I have suggested that she tr[y] to modify her work related activities [ ] so that she could continue to work. Surgery will not necessarily eliminate the likelihood of her having to adhere to these work restrictions.

Dkt. No. 126-3 at 2; Dkt. No. 125-9 at ¶¶ 35–37.

Defendant received a number of complaints from Plaintiff's co-workers alleging that Plaintiff was acting as a supervisor by directing others to do her work. Dkt. No. 125-9 at ¶ 38. On November 21, 2017, Defendants Diebel and Mancino and a third employee of Defendant met with Plaintiff and the president of Plaintiff's union ("Union President"), to discuss Plaintiff's conduct and job responsibilities. *Id.* at ¶ 39; Dkt. No. 150-4 at 66:8–13. During the meeting, Defendant counseled Plaintiff to refrain from directing her co-workers to perform her duties and to inform her supervisors of any job function that she was physically incapable of performing. Dkt. No. 125-9 at ¶¶ 40–41. The meeting was memorialized in a memorandum, signed by Plaintiff. Dkt. No. 125-2 at 12–13. Plaintiff's filing duties were subsequently performed by others, in addition to

their own job responsibilities, for the remainder of her employment.[7]  Dkt. No. 125-9 at ¶¶ 43, 49–

51.

      The Union President testified that sometime in advance of Plaintiff's trip to India in 2018,

he had the following conversation with Defendant Diebel:

> It was something like I don't buy it or yeah, it's not really spiritual, you know[,] I
> think [Plaintiff] just wants a free vacation on her parents or something like that
> because she would go with her parents and -- and, you know, her parents pretty
> much pay for it.  I mean if she couldn't. . . . go -- if that -- [Plaintiff] had stated that
> if she couldn't go, it would cost her more money than it would if she went with
> them.
>
> . . .
>
> [T]he prior vacation cycle, when [Plaintiff] took her time off for her spiritual retreat
> in [February] with her family like she had done in the past, [Defendant Diebel] was
> not happy about it.  We discussed it at length that she thought she should not be
> allowed to take [three] weeks off.
>
> She thought it was to -- to the detriment of other employees and their ability to get
> off, which I explained to her contractually, that's not the case.  And she made
> comments to me along the lines of she's not getting that time off again.

Dkt. No. 150-4 at 47:15–24, 72:19–73:5.

      Plaintiff alleges that sometime in March 2018, after she had returned from her three-week

trip, Defendant Mancino stated to her "I don't care for your religion or spirituality, you are never

going to get this kind of time off again."  Dkt. No. 10 at 10.  Plaintiff also alleges that, following

her trip, Defendant Lee "stated that she was pleased with my work and. . . . she said that whatever

---

[7] The Union President testified that sometime in late 2017, "I warned [Plaintiff] that if she was to
put in documentation making herself fifty-one percent disabled, they would probably terminate
her. . . . I didn't think [Plaintiff] fully understood [ ] the position she was putting herself in.  I -- I
-- I -- I think I might have said you're a file clerk who can't file."  Dkt. No. 150-4 at 109:4–16,
111:18–21.

you do, keep praying to your God."[8]  Dkt. No. 150-2 at 373:6–10.  There is no evidence in the record that Plaintiff raised any of these alleged comments with Defendant, her union, or anyone else prior to the termination of her employment the following year.

On September 18, 2018, Plaintiff submitted a "time off request" to Defendant Lee with the following dates: (i) February 4–March 1 for "travel to India;" (ii) July 5; (iii) July 23–26; and (iv) August 13–19.  Dkt. No. 125-9 at ¶ 84; Dkt. No. 125-2 at 183.  On October 9, 2019, not having received a response, Plaintiff forwarded her original email to Defendant Lee and additionally requested time off for April 16–23.  Dkt. No. 125-9 at ¶ 85; Dkt. No. 125-2 at 182–83.  In her second email, Plaintiff for the first time stated that, as to the approximately seven weeks for which she was requesting annual leave, "all my requests are strictly for spiritual purposes."[9]  Dkt. No. 125-2 at 182–83.

On October 26, 2018, after consulting with Defendant's Office of Labor Relations ("Labor Relations"), Defendant Diebel approved all of Plaintiff's requests, except the entirety of the four-week period between Monday, February 4 and Friday, March 1.  Dkt. No. 125-9 at ¶¶ 88–91, 94; Dkt. No. 125-2 at 182.  As to that period, Defendant Diebel directed Defendant Lee to inform Plaintiff that she could take leave from February 4 until February 13, the date on which she was expected to return to work.  Dkt. No. 125-9 at ¶ 93; Dkt. No. 125-2 at 182.  Defendant Lee explained to Plaintiff that this partial approval was "[d]ue to the operational needs of the court. . . . as we are short-handed, have one new employee who is still being trained[,] and one starting in a

---

[8] Plaintiff testified that she didn't "remember exactly" whether it was following her 2017 or 2018 trip when Defendant Lee allegedly made this remark.  Dkt. No. 150-2 at 373:8–9.

[9] On December 31, 2018, Plaintiff states that she "learned a very close family member in India suddenly died" and that she, at that time, requested approval of the balance of her February 2019 leave request "for this reason that there was a death in the family."  Dkt. No. 128 at ¶ 39.

few week[s] who will need to be trained." Dkt. No. 125-9 at ¶ 95–96; Dkt. No. 125-2 at 182.

On November 12, 2018, Defendant Diebel again solicited guidance regarding Plaintiff

from Labor Relations. Dkt. No. 125-9 at ¶ 52. Defendant Diebel stated in her request that:

> [Plaintiff] has been claiming for the past year or more that she is restricted from performing part of her job responsibilities due to physical conditions. Please see some correspondence, etc.[,] attached to this email. To date, we have not had any information provided to us from her physician suggesting what accommodations we could make for her other than not having her file, lift, raise her arms, etc. The issue is that the majority of her job related duties entail such activity since she works as a file clerk in the Albany City Court Criminal Part. Apart from having someone do her job (which is essentially what is happening), we do not know how to accommodate her.
>
> Last November, I counseled [Plaintiff] (see attached memo and her response) because she was directing other employees to do her work and was essentially acting in a supervisory manner at work. She denied this but we had received several complaints from co-workers (as did the Union). . . . We are also short staffed in this part. [Plaintiff] continues to be unable to perform what we view as the majority of her job duties.
>
> As a side note, [Plaintiff] has regularly asked for a month off in [February] to travel to India. We denied it this year based on operational needs of the court since we have a shortage of help in that part. We will have some new employees starting but training will be ongoing December – February. We simply cannot let anyone off right now until [the] new employees are trained and working efficiently.

Dkt. No. 125-2 at 171–72; Dkt. No. 125-9 at ¶ 52. In response, Labor Relations stated:

> The last medical from the employee's doctor in November 2017 . . . seems to indicate to me that she's permanently incapacitated from performing her job inasmuch as he states that even with surgery (which they seemingly can't/won't even do given other medical issues), she will likely never be able to work without these various limitations that are preventing her from performing the essential functions of her job. However, before going the route I am thinking – which is actually recommending her termination under [the collective bargaining agreement with Plaintiff's union], i.e.[,] permanently incapacitated from performance of her job duties – I think it might be a good idea to have another meeting with her like you did last year to discuss these ongoing concerns and that you need updated medical from her doctor so you have a better understanding of what she can/can't do and for how long and a determination can be made as to how to move forward . . . the current arrangement is not working nor is it reasonable, as it's been well over a year that you've been trying to accommodate her (which is essentially having other employees including her supervisor assist) and there has seemingly been no

change/improvement in her condition.

Dkt. No. 125-2 at 171; Dkt. No. 125-9 at ¶¶ 53–54.  Defendant subsequently made a request for updated medical information to Plaintiff's physician.  Dkt. No. 125-9 at ¶ 55.

On November 30, 2018, Plaintiff filed a grievance with Defendant, claiming that the partial approval of her annual leave request violated the collective bargaining agreement ("CBA") between Defendant and Plaintiff's union, the Civil Service Employees Association, Inc., Local 1000, AFSCME (AFL-CIO).  Dkt. No. 125-9 at ¶¶ 98–99; *see also* Dkt. No. 125-2 at 23–169.  The grievance did not raise the alleged discriminatory comments described above, nor any claim of religious discrimination.  Instead, the stated basis for the grievance read as follows:

> [Plaintiff] is the highest seniority in her title in the Albany City Criminal Court. She [r]equested [l]eave for February 2019 and was denied some of the dates based on the operating needs.  Based on her title and responsibilities, we do not agree that the operating needs warrant her annual leave denial.

Dkt. No. 125-2 at 184–85.

By letter dated December 11, 2018, Plaintiff's physician provided further documentation stating that Plaintiff should continue with the work restrictions he had communicated previously, and that "[t]hese work restrictions are permanent restrictions."  Dkt. No. 125-9 at ¶¶ 55–56; Dkt. No. 126-4 at 2.

On December 17, 2018, Defendant met with Plaintiff to discuss her medical condition. Dkt. No. 125-9 at ¶ 57.  During this meeting, Plaintiff confirmed that due to her physical limitations, she would continue to require the level of assistance provided by her co-workers.  *Id.* at ¶ 58.  Plaintiff asked to be reassigned to a position that did not require filing.  *Id.* at ¶¶ 59, 61. Defendant informed Plaintiff that there were no other assignments available for her current position and pay level.  *Id.* at ¶¶ 60, 62.

On December 19, 2018, Defendant denied Plaintiff's grievance, citing the CBA and stating,

in part, that the "operational needs of the court due to staffing shortages will not allow for an employee of Albany City Court, Criminal Part, to have over a week of annual leave during February [2019]." *Id.* at ¶ 100.

Plaintiff alleges that sometime in December, prior to Christmas, Defendant Mancino said to her "I heard you go home for lunch every day and that you go home to pray," and then asked "[d]o you do that because you have to or you want to?"  Dkt. No. 150-2 at 370:4–24; *see also* Dkt. No. 10 at 11.  There is no evidence in the record that Plaintiff raised this alleged comment with Defendant, her union, or anyone else prior to the termination of her employment the following month.

On December 26, 2018, following further consultation with Labor Relations, Defendant Diebel made a detailed written recommendation to Defendant's Deputy Chief Administrative Judge for Courts Outside of New York City ("Deputy Chief") that Defendant terminate Plaintiff as an incapacitated employee under the CBA.  *Id.* at ¶¶ 63–72; Dkt. No. 125-2 at 174–177.

On January 3, 2019, the Deputy Chief issued a letter terminating Plaintiff on the grounds that:

> You have been unable to perform the full duties of your position for over one year, during which time your position has been substantially modified in order to accommodate your physical (medical) limitations/restrictions.  The most recent medical documentation that you provided indicates that these work restrictions are permanent, i.e.[,] you are permanently incapacitated from performing the necessary duties of your position.

Dkt. No. 125-9 at ¶¶ 73–75; Dkt. No. 125-2 at 178–80.  Individual Defendants notified Plaintiff of her termination during a meeting on January 7, 2019, also attended by the Union President, at which time Plaintiff received a copy of her termination letter.  Dkt. No. 125-9 at ¶ 76; Dkt. No. 150-2 at 455:2–22; Dkt. No. 150-4 at 117:3–25.

**C.  Plaintiff's Appeal**

On January 11, 2019, Plaintiff administratively appealed her termination with Defendant. *Id.* at ¶ 102. Plaintiff was represented by counsel for purposes of the attendant evidentiary hearing and related briefing. *Id.* at ¶¶ 103–07. Plaintiff's appeal did not raise the alleged discriminatory comments described above, nor any claim of religious discrimination. *See* Dkt. No. 125-6 at 19–147. The hearing officer for the appeal recommended that Plaintiff's termination be upheld and found as follows:

> [I]t is undisputed that: (1) the position of Senior Court Office Assistant entails a significant amount of filing; (2) [Plaintiff]'s doctors advised that she was unable to perform the job duty of filing due to a degenerative spinal condition and that [Plaintiff]'s work restrictions were permanent; (3) [Plaintiff] repeatedly requested assistance with her filing duties; (4) [Plaintiff]'s doctors never requested any accommodations which would allow [Plaintiff] to perform her job duties, other than a lightweight headset;[10] and (5) the accommodations provided to [Plaintiff] (that is, filing assistance from her supervisors and co-workers) for the period of November 2017 through January 2019 were a burden on court operations. Given the foregoing, the evidence demonstrated that [Plaintiff] was unable to perform the full duties of her position for a period of over one year and that [Plaintiff]'s work restrictions were permanent. Therefore, in accordance with [a particular provision] of the CBA, Ms. Gandhi's termination was appropriate.

Dkt. No. 125-6 at 157.

By letter dated January 10, 2020, the Deputy Chief concurred with the hearing officer's analysis and recommendation, concluded that "the evidence established that [Plaintiff] suffers from a disability, and that such disability incapacitated [Plaintiff] from performing the essential duties of her positions from April, 2017 through at least December, 2018, when [Plaintiff]'s work restrictions were deemed to be permanent," and denied Plaintiff's appeal. Dkt. No. 125-6 at 161; Dkt. No. 125-9 at ¶¶ 111–12.

### D. Plaintiff's New York State Division of Human Rights Complaint

The same day that she administratively appealed her termination in January 2019, Plaintiff

---

[10] Defendant provided this accommodation. Dkt. No. 125-9 at ¶ 37.

filed a complaint with the New York State Division of Human Rights ("Division of Human Rights"), alleging that Defendant had engaged in "an unlawful discriminatory practice relating to employment because of disability, creed, [ ] discrimination/retaliation, [and] age." Dkt. No. 125-7 at 201. In July 2019, after an investigation, the Division of Human Rights issued a written determination which concluded:

> While [Plaintiff]'s burden as this stage is considered de minimis, [s]he must produce some evidence, beyond conclusory assertions, showing circumstances sufficient to support an inference of discriminatory intent. [Plaintiff]'s own subject belief, absent further proof, is insufficient to support a finding of discrimination.
>
> The complaint is therefore ordered dismissed and the file is closed.

*Id.* at 204–05; *see also* Dkt. No. 125-9 at ¶ 134.

### E. Plaintiff's EEOC Complaint

Following her termination, Plaintiff also submitted a charge to the United States Equal Employment Opportunity Commission ("EEOC"). Dkt. No. 125-9 at ¶ 135. In November 2019, the EEOC adopted the findings of the Division of Human Rights, dismissed the charge, and closed its file on the matter. *Id.* at ¶ 136; Dkt. No. 125-7 at 206–07.

### F. Plaintiff's Contract Grievance

In April 2019, during the pendency of her administrative appeal, Plaintiff filed a contract grievance under the CBA. Dkt. No. 125-9 at ¶ 117. The subsequent arbitration determined—as a procedural matter pursuant to a particular provision under the CBA—that Plaintiff's termination should have been held in abeyance until the Deputy Chief's final determination. Dkt. No. 125-8 at 30. As a result, the arbitrator awarded Plaintiff back pay and commensurate benefits for the period between her termination in January 2019 and the Deputy Chief's final determination in January 2020. *Id.* Following the confirmation of this arbitration award in New York State Supreme Court, New York County in July 2022, Defendant paid Plaintiff the amount awarded.

Dkt. No. 125-9 at ¶¶ 127–30.

### G.  Plaintiff's Article 78 Petition

In November 2020, Plaintiff initiated an Article 78 proceeding in New York State Supreme Court, Albany County, against Defendant, Individual Defendants, and the hearing officer who handled her administrative appeal.  Dkt. No. 125-9 at ¶ 113.  Plaintiff's written submissions challenging Defendant's decision to terminate her do not reference the alleged discriminatory comments described above, nor any claim of religious discrimination.  Dkt. No. 125-7 at 5–7, 10–18.  The proceeding was transferred to the Appellate Division, Third Department in May 2021.  *Id.* at 194–97.  Plaintiff received numerous extensions to perfect her appeal before its eventual dismissal in November 2023.  *Matter of Rajni Gandhi v. New York State Unified Court System et al.*, Index No. 534125, N.Y. App. Div., 3d Dep't.

## III.    STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).  A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986).  "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36–37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249–50).

## IV.    DISCUSSION

### A.  *McDonnell Douglas* Framework

Title VII provides that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Plaintiff alleges that Defendant engaged in religious discrimination in violation of Title VII by terminating Plaintiff's employment in response to her request for annual leave to "travel to India . . . for religious purposes." Dkt. No. 10 at 10. As detailed above, Plaintiff further alleges that Defendant Mancino made discriminatory comments in March 2018 and December 2018. *See*

Section II.B, *supra*.  Plaintiff's *pro bono* counsel has identified additional comments in the record allegedly made by Defendants Diebel and Lee and argues that these comments were also discriminatory.  *See* Dkt. No. 150 at 8–9.

Plaintiff's Title VII religious discrimination claim is "analyzed under the burden-shifting framework" articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003); *see also Privler v. CSX Transp. Inc.*, No. 18-cv-1020, 2021 WL 3603334, at *12–13 (N.D.N.Y. Aug. 13, 2021); *accord King*, 96 F.4th at 562.  At summary judgment, under the *McDonnell Douglas* burden-shifting framework:

> A plaintiff's first step . . . is to establish a prima facie case of discrimination by showing that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." . . . The burden at this stage "is not onerous." . . . Once the plaintiff has established a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its adverse action. . . . Upon that showing, the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for the discrimination.

*Bart*, 96 F.4th at 570 (citations omitted).  "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Borzon v. Green*, 778 F. App'x 16, 18 (2d Cir. 2019) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

At the third step, a plaintiff's burden is to "'establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination.'"  *Wheeler v. Praxair Surface Techs., Inc.*, No. 21-cv-1165, 2023 WL 6282903, at *14 (S.D.N.Y. Sept. 26, 2023) (quoting *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019)).  A plaintiff is not, however, "'required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that a prohibited factor was at least one of the 'motivating' factors' for the decision."  *Id.* (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d

Cir. 2008)).  As the Second Circuit has recently explained, both "pretext" cases and so-called "mixed-motives" cases, where a plaintiff may make "a showing that even if the employer's reason is true, discrimination was still a motivating factor in the employment decision[,]" are properly analyzed under the *McDonnell Douglas* framework.  *Bart*, 96 F.4th at 573–76 (discussing the history of the third step "pretext" analysis and concluding that "[w]hile we use 'pretext' as shorthand, we have explained that a more complete characterization of a plaintiff's third-stage burden in mixed-motives cases is to produce 'admissible evidence . . . show[ing] circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based *in whole or in part* on discrimination'") (quoting *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016)) (emphasis added).

### B.  Defendant is Entitled to Summary Judgment

For purposes of step one, after resolving all ambiguities and drawing all reasonable inferences against Defendant, the Court finds that Plaintiff has satisfied her burden to demonstrate a prima facie case of religious discrimination.  *See Matsushita Elec. Indus.*, 475 U.S. at 587; *see also* Dkt. No. 134 at 12–14.

As to step two, Defendant argues that it has proffered a legitimate, non-discriminatory reason for Plaintiff's termination, namely, that "she was unable to perform the essential functions of her position as a senior court office assistant, due to her medical condition, and that the accommodations provided to her over the course of a year placed an undue burden on the operation of the clerk's office."  Dkt. No. 147-1 at 8.  As to Plaintiff's partially approved leave request, Defendant argues that "the remainder of her requested time off was denied because the clerk's office was short staffed and Plaintiff's extended absence would further strain operations."  *Id.* at 10.  Plaintiff does not persuasively oppose Defendant's arguments for purposes of step two, instead

arguing that she should prevail at step three. *See* Dkt. No. 150 at 7–10. The record before the Court establishes that Plaintiff's job responsibilities involved a significant amount of filing; that Plaintiff's physician provided medical documentation "permanent[ly] restrict[ing]" Plaintiff from filing; and that Plaintiff's approximately four weeks of requested leave for February 2019 would have strained the operations of the clerk's office. *See* Section II.B, *supra*. Accordingly, the Court finds that Defendant has satisfied its burden at step two of the *McDonnell Douglas* framework.

As to step three, Defendant argues that "even when viewed in the light most favorable to Plaintiff, the evidence proffered does not raise a question of fact as to whether Plaintiff's termination was motivated in part by religious discrimination." Dkt. No. 147-1 at 12. In particular, Defendant asserts that there is no evidence that Defendant Mancino was involved in partially approving Plaintiff's leave request in October 2018, nor that he was involved in the decision to terminate Plaintiff in January 2019. *Id.* at 12–13. In opposition, Plaintiff argues that because Defendant Mancino allegedly made discriminatory comments, was among the attendees at the meeting at which Plaintiff was terminated, and was also among the individuals copied on a letter related to her termination, he "was involved in her termination." Dkt. No. 150 at 7–8. Plaintiff further asserts that Defendant Lee and Defendant Diebel also made discriminatory comments. *Id.* at 8–9.

The Court largely agrees with Defendant. Plaintiff has not satisfied her burden to establish that Defendant's stated reasons for partially approving her annual leave or for terminating her are pretextual, nor that religious discrimination was a motive in either decision. As to the former, Defendant approved Plaintiff's requests for three weeks of consecutive leave in 2011, 2012, 2013, 2014, 2015, 2016, 2017, and 2018. Despite working at Defendant for close to two decades, and the Albany City Court generally having several dozen employees, Plaintiff could identify only two

coworkers who had ever requested three consecutive weeks of leave; no coworkers who had actually taken three consecutive weeks of leave; and no coworkers who had routinely taken three consecutive weeks of leave. Dkt. No. 125-9 at ¶¶ 10, 13; Dkt. No. 150-2 at 450:11–452:20. In addition, Defendant's contemporaneous communications, both with and regarding Plaintiff, establish that the "operational needs of the court due to staffing shortages w[ould] not allow for an employee of Albany City Court, Criminal Part, to have over a week of annual leave during February [2019]." Dkt. No. 125-9 at ¶ 100.

Plaintiff's primary evidence of discriminatory intent related to the partial approval of her 2019 annual leave is the alleged comment by Defendant Mancino in March 2018: "I don't care for your religion or spirituality, you are never going to get this kind of time off again." Dkt. No. 10 at 10. Resolving all ambiguities and drawing all reasonable inferences against Defendant, *see Matsushita Elec. Indus.*, 475 U.S. at 587, and assuming for purposes of summary judgment that Defendant Mancino made this comment, it is nevertheless the case that he did not make the decision regarding Plaintiff's leave request, nor did he make any recommendation regarding Plaintiff's leave request. Dkt. No. 125-9 at ¶ 97; Dkt. No. 125-4 at ¶¶ 23–24. Defendant Diebel was the person who partially approved Plaintiff's seven-week leave request in October 2018, and Defendant Lee, as Plaintiff's direct supervisor, was the person who communicated that decision. *See* Dkt. No. 125-9 at ¶¶ 88–91, 93–94. As such, Defendant Mancino's alleged comment is not "sufficient to permit a rational finder of fact to infer that" the partial approval of Plaintiff's seven weeks of annual leave "was more likely than not based in whole or in part on discrimination." *Bart*, 96 F.4th at 576 (citation omitted); *see also Lenzi*, 944 F.3d at 112. [11]

---

[11] Additionally, as to Defendants Lee and Diebel, the Court finds that their alleged comments are insufficient evidence of discriminatory intent related to the partial approval of Plaintiff's 2019 annual leave. It is well settled that "the stray remarks of a decisionmaker, without more, cannot

Plaintiff similarly fails to establish discriminatory intent related to her termination.  In April 2017, Plaintiff informed Defendant that she would be unable to perform her filing responsibilities for medical reasons.  Dkt. No. 125-9 at ¶ 24.  Over the ensuing months, as Plaintiff's co-workers retrieved and carried files for her (and also complained about doing so), Defendant communicated with Plaintiff and her treating physician regarding Plaintiff's work limitations and potential reasonable accommodations.  *Id.* at ¶¶ 26–38.  In November 2017, Defendant counseled Plaintiff to refrain from directing her co-workers to perform her own responsibilities.  *Id.* at ¶¶ 39–41.  In late 2017, the Union President warned Plaintiff that she risked termination if she submitted documentation establishing that she was "a file clerk who can't file."  Dkt. No. 150-4 at 109:4–16, 111:18–21.  In December 2018, Plaintiff's physician submitted documentation indicating that Plaintiff's filing restrictions were "permanent restrictions," and Plaintiff subsequently confirmed to Defendant that she would continue to require significant assistance from her co-workers.  Dkt. No. 125-9 at ¶¶ 55–58.  As a result, Defendant Diebel recommended that the Deputy Chief terminate Plaintiff as an incapacitated employee under the CBA, which the Deputy Chief did in January 2019.  *Id.* at ¶¶ 63–75.

Plaintiff's claim that her termination was nonetheless at least partially discriminatory relies

---

prove a claim of employment discrimination[.]"  *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 266 (2d Cir. 2023) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)); *see also Lenzi*, 944 F.3d at 112 ("[W]e consider four factors when assessing the probative value of such remarks: ['](1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).[']") (quoting *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)). The Court finds that the alleged comment by Defendant Lee, in either early 2017 or in early 2018, is at best a stray remark, given that it is substantively unrelated and temporally disconnected from Defendant Diebel's decision regarding Plaintiff's annual leave in October 2018.  Similarly, to the extent that the alleged comments by Defendant Diebel some time prior to February 2018 constitute admissible evidence, the Court finds that they are stray remarks, as well.

heavily on the alleged comment by Defendant Mancino in December 2018:[12] "I heard you go home for lunch every day and that you go home to pray. . . . . Do you do that because you have to or you want to?"  Dkt. No. 150-2 at 370:4–24; *see also* Dkt. No. 10 at 11.  Again resolving all ambiguities and drawing all reasonable inferences against Defendant, *see Matsushita Elec. Indus.*, 475 U.S. at 587, and assuming that Defendant Mancino made this comment, it is nevertheless the case that Defendant Mancino did not make the decision to terminate Plaintiff, nor did he recommend Plaintiff's termination.  Dkt. No. 125-9 at ¶¶ 80–81; Dkt. No. 125-4 at ¶¶ 19–20.  In fact, following consultation with Labor Relations, Defendant Diebel recommended that the Deputy Chief terminate Plaintiff.  Dkt. No. 125-9 at ¶¶ 63–65; Dkt. No. 125-2 at 174–177.

Plaintiff's conclusory argument that Defendant Mancino must have been involved with her termination because he was one of the attendees at the January 7, 2019 meeting and was copied on related correspondence fails to raise a genuine dispute of material fact.  Dkt. No. 150 at 8–10.  By the same logic, the Union President was also involved in Plaintiff's termination, as he attended the January 7, 2019 meeting and was copied on related correspondence, as well.  Dkt. No. 150-4 at 117:3–25; Dkt. No. 125-2 at 178–80.  Moreover, and as correctly pointed out by Defendant, the case law on which Plaintiff relies for this argument is distinguishable.  *Compare* Dkt. No. 150 at 8 n.2, *with* Dkt. No. 151 at 4–5.  In *Hellwig v. County of Saratoga*, the defendant at issue advocated for the plaintiff's termination.  No. 22-cv-488, 2024 WL 3791238, at *9 (N.D.N.Y. Aug. 13, 2024).  Here, Plaintiff offers no such evidence that Defendant Mancino influenced, or even attempted to influence, Defendant's decision to terminate Plaintiff.

---

[12] The Court finds that the alleged comment by Defendant Mancino in March 2018, the alleged comments by Defendant Diebel sometime prior to February 2018, and the alleged comment by Defendant Lee in either early 2017 or in early 2018 are all substantively unrelated and temporally disconnected from Defendant's decision to terminate Plaintiff in January 2019.  *See* n.11, *supra*.

In sum, Plaintiff has failed to provide "admissible evidence . . . show[ing] circumstances that would be sufficient to permit a rational finder of fact to infer" that Defendant's stated reasons for partially approving Plaintiff's seven-week annual leave request and for terminating her as an incapacitated employee under the CBA were "more likely than not based in whole or in part on discrimination." *Bart*, 96 F.4th at 576 (citation omitted). Accordingly, the Court finds that Plaintiff has not met her burden at step three of the *McDonnell-Douglas* framework.

## V.   CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, Dkt. No. 147, is **GRANTED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules, and close the case.

**IT IS SO ORDERED.**

Dated: October 16, 2024
       Albany, New York

Anne M. Nardacci
U.S. District Judge